**In re ROE EXCAVATING, INC., I.D. #31–0871600, Debtor.**

**ROE EXCAVATING, INC., Movant,**

**v.**

**THORP DISCOUNT, INC. OF OHIO, Respondent.**

**Bankruptcy No. 1–84–01952.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Sept. 7, 1984.

John P. Scahill, Cincinnati, Ohio, for debtor in possession.

John McNally, Cincinnati, Ohio, for Thorp.

## DECISION AND ORDER RE ADEQUATE PROTECTION

BURTON PERLMAN, Bankruptcy Judge.

This voluntary Chapter 11 case was filed August 10, 1984. Debtor is in a branch of the construction business having to do with excavation and earth moving. The operation of the business obviously is totally dependent upon excavation and earth moving equipment owned by debtor in which Thorp Discount, Inc. of Ohio (hereafter "creditor") has a security interest. Prior to the filing of the bankruptcy case, creditor had proceeded in the state courts of

Ohio by writ of attachment obtained ex parte to secure possession of debtor's equipment. Debtor then moved in this court for an order directing that creditor return the equipment. After a hearing in this court at which counsel for debtor and creditor were both present, we signed such an order on August 13, 1984. It was provided in that order that there would be "a hearing on the merits" regarding the turnover. Prior to the hearing, we advised counsel that the agenda for the hearing, based on *United States v. Whiting Pools, Inc.*, 459 U.S. 1033, 103 S.Ct. 442, 74 L.Ed.2d 599 (1983), would be whether there was adequate protection for the creditor. A pretrial conference was held and the matter came on for hearing. At the conclusion of the hearing we reserved decision. We here present our findings of fact and conclusions of law which arise from the record made at that hearing.

■ At the outset of the hearing on the merits, creditor called the attention of the court to the fact that some of the collateral by which creditor was secured was owned, not by the debtor, but by an individual not in Chapter 11. Creditor argued that such collateral should be excluded from consideration on the question of adequate protection of creditor. We reserved decision at that time. We now overrule that motion. Simply stated, as will be seen hereafter in our review of the evidence, the collateral in question was considered by creditor to be part of its security for the undivided loan which it made to debtor. It would be unjust now to exclude that collateral from a determination of whether this creditor is adequately protected with regard to its security interest.

Creditor argues that *In re Xinde International, Inc.*, 13 B.R. 212 (Bankr.D.Mass. 1981) is authority to the contrary. We are unwilling so to regard it. Our reading of the case indicates that the facts there are not comparable to those before us, in that there is no showing that a security interest in real estate owned by the third party realty trust was part of the security taken by the creditor for its loan. The court in that case remarks only that the secured creditor had security interests in the equipment, fixtures, inventory and accounts receivable of the debtor. Neither of the other two cases cited by creditor is in point. Both *In re Sarah Bay Co.*, 35 B.R. 623 (Bankr.Minn.1983) and *In re Santoro Excavating, Inc.*, 32 B.R. 947 (Bankr.S.D.N.Y. 1983) deal with a determination of secured status of a creditor and are unrelated to the question of adequate protection.

We turn then to the central question before us, that defined by *United States v. Whiting Pools, Inc.*, 459 U.S. 1033, 103 S.Ct. 442, 74 L.Ed.2d 599 (1983). That case prescribes the conditions for a turnover of property of the estate held by an entity which came into possession of it before the filing of the bankruptcy case. *Whiting Pools* holds that the turnover must be conditioned on the provision of adequate protection for the interest of the secured creditor, pursuant to § 363(e) of the Bankruptcy Code. (It was necessary for us to depart from the strict letter of *Whiting Pools* in order to adapt it to the exigencies of the instant case. This was so because the equipment which the creditor had taken possession of prior to the filing of the bankruptcy case obviously was indispensable to any rehabilitative effort of this Chapter 11 debtor. We adhered to *Whiting Pools* so far as the realities of this case permitted, by scheduling an early hearing on the question of adequate protection).

A fair statement of the meaning of adequate protection is to be found in *In re Nixon Machinery Company*, 9 B.R. 316, 317 (Bankr.E.D.Tenn.1981) where the court said:

> Adequate protection generally is meant to preserve the secured creditor's position at the time of bankruptcy. If the automatic stays are meant to preserve the status quo of the debtor, adequate protection is meant to preserve the status quo for the secured creditor. 2 Collier on Bankruptcy ¶ 361.01 at 361–6 (15th ed. 1979).

The logical starting point for the present inquiry is what it was that the creditor

required and obtained as collateral for its loan, and so we examine first those documents relating to the transaction which were made part of the record at the hearing by the parties. Debtor by its president, Geraldine V. Roe executed a promissory note dated April 28, 1983 with a maturity date of January 28, 1984 for a principal amount of $496,000.00 in favor of Thorp Discount, Inc. An interest rate is provided as is a payment schedule. The payment schedule requires eight consecutive monthly installments of $15,500.00 each commencing May 28, 1983 with a balloon payment equal to all unpaid principal and interest on January 28, 1984. The loan represented by the note was advanced by creditor at a time when debtor was having difficulties with another lender, and was made according to creditor's loan officer, for the purpose of extricating debtor from those difficulties.

With respect to collateral the note says:

This Note is secured by a security agreements (sic) of even date herewith and dated November 25, 1981 and real estate mortgages of even date herewith and dated November 25, 1981 covering certain personal and real property of the undersigned, copies of which mortgage and security agreement of even date herewith have been delivered to the undersigned with a copy of this Note and copies of which prior mortgage and security agreement have been previously delivered to the Borrowers. No collateral under either the security agreements or mortgages may be sold or transferred without the express written permission of Lendor.

In addition to execution by Geraldine V. Roe as president of debtor, Mrs. Roe signed the instrument individually, as did Roger Roe. The note was also executed by an entity 4 R R, Inc. by its president Roger H. Roe. In the course of the hearing we were informed that the latter corporation is a wholly owned corporation of the debtor and has a specified function in the operation of debtor.

In addition to the promissory note, there is in evidence a Security Agreement (CX # 30) which relates to personal property. The security agreement is executed by the same parties who executed the note. The security agreement contains a very comprehensive and detailed recitation of personal property of the signatories, including accounts receivable and equipment. We single out these two species of personal property from a much longer list, because these are the ones with which the parties dealt at the hearing. There is no real estate mortgage in the evidence but from the testimony presented at the hearing, it is clear that in connection with the transaction creditor was given a mortgage on real estate. Such real estate is currently occupied by debtor in connection with its excavating operation and is used for storage primarily. The legal title holder of the realty is Geraldine V. Roe.

At the maturity date of the note, January 28, 1984, the note was not paid off by debtor. The payments called for in the note were made during its term but debtor was unable to make the called for balloon payment. A new arrangement was entered into between creditor and debtor in about February, 1984 pursuant to which debtor was to pay $3,500.00 per week to creditor. Debtor has not made the payments required by this agreement. It made only partial payments in March and June 1984, which partial payments totalled $5,000.00. We have been provided with no documents regarding this agreement and are uninformed as to whether it was executory at the time of the filing of debtor's bankruptcy case. Creditor's representative merely testified at the hearing that debtor then owed creditor $525,000.00 and that interest was accruing at the rate of $321.00 per day.

With respect to the real estate, both parties presented appraisal testimony by real estate appraisers. The real estate consists of two distinct portions of a single tract. One portion consists of 12.4 acres in the river bed of the east fork of the Little Miami River. The other portion comprises 8.5 acres said to be level usable land. The

river bed acreage provides sand and gravel used by debtor. The fair market value for the entire tract in the opinion of debtor's appraiser was $185,000.00. At about the time of the making of the present loan in early 1983, creditor's appraiser also appraised it at that value. Creditor's appraiser at the time of the hearing, however, appraised the real estate at $50,000.00, explaining that for the current appraisal he was permitted by creditor to utilize assumptions which he thought valid. He said that when he made the earlier appraisal he was directed by Thorp to make certain assumptions with which he disagreed. This patent manipulation of the appraisal process by creditor does not appeal to us, and as a matter of fairness and equity we hold that creditor is estopped to assert an appraisal value other than that on the basis of which it made its loan. We hold that the fair market value of the real estate here in question is $185,000.00.

Evidence was offered at the hearing regarding debtor's accounts receivable, another item of creditor's collateral. A document (DX # 4) showed that accounts receivable billed and uncollected for May, June and July totalled $223,850.00. This figure must be adjusted downward because Roger Roe testified that two accounts had recently been collected. There was further testimony by debtor's accountant that in the thirty days following billing approximately 50% of accounts billed for the prior month are collected. Taking into account the accrual in the course of a month of new billings we find a fair figure for accounts receivable collateral to be $150,000.00. We observe that this item of collateral is substantially greater than accounts receivable at the time the loan was originally given. This may be inferred from the testimony that business for 1981, 1982 and 1983 had been very bad.

Both parties presented expert appraisal testimony regarding the equipment component of creditor's collateral, and there was a sharp difference in appraisal values by them. That difference may be accounted for by the fact that they used different appraisal standards. That is, debtor's evidence was based on fair market value, while creditor's was based on liquidation values. Thus, debtor's outside appraiser gave a fair market value for debtor's equipment at retail of $450,700.00 and wholesale at $386,300.00. Roger Roe of debtor estimated the fair market value of debtor's equipment at between $500,000.00 and $600,000.00. Creditor's outside appraiser, Elmore, valued the equipment at $242,000.00. His testimony was that he was assuming a sale "today". It was clear that he was appraising at liquidation value, particularly since he was not allowing time necessary to secure the most favorable price. In addition to the outside expert appraiser, creditor presented an appraisal by its loan officer, DeGrave, who had made the appraisal upon which the loan was based in the first place. His appraisal, made several days before the hearing, was $308,175.00 auction value and $270,528.00 loan value. His appraisal at the time of making the loan had been auction value $457,350.00 and loan value $361,700.00. To make it clear that DeGrave's valuation was compatible with that of Elmore, DeGrave testified that he had included several items which were not in Elmore's appraisal. There can be no doubt then, that both Elmore and DeGrave were appraising on the basis of liquidation value.

A further dimension with regard to equipment must be commented upon, and was much stressed by creditor. Debtor's equipment undeniably is suffering attrition in value. This is occurring because debtor is operating full tilt and its equipment is being used hard. Its value today is less than it was in February before the season began, and further usage is causing and will cause further attrition.

We must decide which is the proper standard for valuation of the equipment in the present context. The proper approach is stated in *In re Shockley Forest Industries, Inc.,* 5 B.R. 160, 162 (Bankr.N.D.Ga.1980) where the court said:

Determining whether a secured creditor is adequately protected involves a

valuation of the indebtedness owed to the creditor and of the property securing the indebtedness. See *In Re: Rogers Development Corporation,* 2 B.R. 679 (E.D.Va.1980). The legislative history of Section 361 reveals that there is no set standard of valuation applicable to resolve disputes concerning adequate protection. It is said in House Report No. 95–595, 95th Cong., 1st Sess. (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6295:

"The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principles. It is not intended that the courts will develop a hard and fast rule that will apply in every case . . ."

On the same page the court said:

A court should not precipitously sound the death knell for a debtor by prematurely determining that the debtor's prospects for economic revival are poor.

*See also* discussion at 2 Collier on Bankruptcy (15th ed.), pp. 361–14 to 361–17; 2 Bkr-L Ed Summary § 15:4.

■ At this very early stage of this case we cannot conclude that debtor cannot be rehabilitated into a viable business enterprise. Since debtor is operating, we hold that the proper standard to be applied in appraising the value of its equipment is fair market value. This includes a component of time in which to maximize the sale price for the equipment, an approach consistent with continued operation. This is not a mere academic observation for reasons which will hereafter appear. With this conclusion, together with the conclusions we have reached regarding the remaining collateral securing creditor, real estate and accounts receivable, we reach the conclusion that creditor is adequately protected. The total collateral value is in excess of $700,000.00, and creditor is at least as well protected as it was at the time the loan was made. We therefore confirm our earlier order requiring that creditor return to debtor the equipment which was seized.

Notwithstanding this conclusion, we find it necessary, as we did in *In re Mr. D Realty Co.,* 27 B.R. 359 (Bankr.S.D.Ohio 1983), to go further with the consideration of adequate protection. The reason for this is that creditor's secured position is being eroded in two respects. First, debtor is making no payments on its obligation to creditor and has not done so since the early part of this year. Second, as we have pointed out above, because of the usage of its equipment by debtor, necessarily its value decreases. Thus, while creditor may be adequately protected today, we are not convinced that this situation will persist through the period which will terminate upon the confirmation of a plan or other conclusion of this case. The evidence discloses two further matters which we deem relevant at this point. First, debtor's accountant projects the financial prospects for the debtor for the rest of 1984. While a profit is projected, we are unable to see in such projection that this will occur if current payments to creditor are made. The other point upon which we comment is that in his testimony Roger Roe stated that it was his intention in order to deal with this creditor to sell off equipment. (He testified further that he expected to continue to operate notwithstanding the sale of equipment, and believed that he could do so by operating more efficiently. Since the amount of the indebtedness to this creditor exceeds the total value of debtor's equipment, coupled with the fact that Roe expects to continue to operate, it is apparent that it is not debtor's intention to liquidate its entire debt to this creditor by selling its equipment. It must be that a sale to the extent of bringing debtor current on its repayment obligations is contemplated, possibly culminating in a refinancing of the balance then owing.)

In view of the foregoing, debtor must begin forthwith to formulate a program for a sale to realize fair market value of those

items of equipment which it intends to sell. Any sale, of course, must be confirmed by this Court upon notice to creditors. We require that debtor submit to us in writing within twenty (20) days from the date of entry of this Order its plans for the sale of equipment. We will thereafter require on-going reports regarding equipment sales activity to be filed in connection with debtor's required periodic financial statements.

SO ORDERED.